UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| DAVID  BOONE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | 1:15-cv-00779-SEB-MJD |
| | ) | |
| TOWN OF SHERIDAN, | ) | |
| SHERIDAN POLICE DEPARTMENT, | ) | |
| | ) | |
| Defendants. | ) | |

**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

We address here Defendants' Motion for Summary Judgment [Docket No. 34],

filed on March 21, 2016, pursuant to Rule 56 of the Federal Rules of Civil Procedure.

Plaintiff David Boone has brought this action against Defendants, the Town of Sheridan

("the Town") and the Sheridan Police Department,[1] alleging that he was discriminated

against based on his age, in violation of the Age Discrimination in Employment Act of

1967 ("ADEA"), 29 U.S.C. §§ 621 *et seq.*, and that he was subjected to sexual

harassment and retaliation, in violation of Title VII of the Civil Rights Act of 1964

("Title VII"), 42 U.S.C. §§ 2000e et seq. For the reasons detailed in this entry, we

GRANT Defendants' Motion for Summary Judgment.

---

[1] The Sheridan Police Department is not a separately suable entity; therefore, all claims against
the Department are incorporated into the claims Mr. Boone has brought against the city. While
Indiana law designates municipal corporations as suable entities, police departments are not
municipal corporations. *See* I.C. § 36-1-2-10.We therefore GRANT summary judgment in favor
of the Sheridan Police Department. Accordingly, any reference to "Defendant" hereafter refers to
the Town of Sheridan.

## Factual Background

**Plaintiff's Employment Status and Benefits Received**

In 2004, Mr. Boone became a Reserve Officer for the Town of Sheridan. Compl. Ex. A at 2. By fall of 2014, he had been named Captain of the Reserve Department[2] and was responsible for scheduling the shifts for all the Reserve Officers within the Sheridan Police Department. Shock Aff. ¶ 9. His immediate supervisor was Major Coy Monroe. Compl. Ex. A at 2. As Reserve Officer, Mr. Boone was a "volunteer" and received neither wages nor health benefits from the Department. Boone Dep. at 48:15-18. *See* Shock Aff. ¶ 19. During this time, the costs of Mr. Boone's license plates were borne by Defendant as well as the fuel costs incurred while he was on duty. Boone Aff. ¶ 6. Mr. Boone alleges that Defendant "paid all costs associated with maintaining a life insurance policy on [his life] which would provide payment in the event that [he] died while in the line of duty." *Id.* at ¶ 7. Additionally, Defendant underwrote the cost of Mr. Boone's uniforms. Boone Dep. at 48:6-10.

During this time, Mr. Boone "was qualified to accept security related contracts and perform work as a sworn and/or uniformed law enforcement officer." Boone Aff. ¶ 4. His receipt of such contracts was due to his status as a "sworn uniformed officer", who was "vested with arrest powers." *Id.* These contracts were made with third parties and not coordinated through the Town of Sheridan or the Sheridan Police Department. *See id.* Mr. Boone alleges that "[a]s a result of losing [his] status as a sworn officer", the

---

[2] Mr. Boone's former position has also been referred to as Reserve Commander. See Compl. ¶ 22.

opportunities for third-party contract work were limited because "many jobs require one to be a sworn officer, and those jobs which do not, individuals who are not sworn officers no longer command the same hourly rate." *Id.*

In addition to being a Reserve Officer, Mr. Boone was a certified general instructor, having taken classes to qualify as a Field Training Officer and as a Taser Instructor. *Id.* at ¶ 5. He "participated in regular training sessions, monthly training sessions, as well as special training sessions" to maintain these certifications and qualifications. *Id.* The expenses related to this training were covered by the Town during the time he served as Reserve Officer; because he no longer serves in that capacity, these expenses will be personally paid for by him. *Id.*

Plaintiff's status as Reserve Officer entitled him to certain, select benefits related to retail transactions with third parties, such as "as much as [a 20% discount] on firearms and ammunition." *Id.* ¶ 8. Without an entitlement to such discounts, Mr. Boone's "personal and business costs for firearm and ammunition[-]related purchases [have] increased." *Id.*

**Plaintiff's Report of Complaints Regarding Sexual Harassment**

On September 22, 2014, fellow officers complained to Mr. Boone that Chief Shock had been overheard making sexual comments to a female Reserve Officer. Specifically, Mr. Boone alleges that he was told that Chief Shock had said to a female Reserve Officer that she should "crawl under her professor's desk and earn her grade." He also reportedly asked the female officer "what type of panties she wore, thongs or boy shorts." Compl. ¶¶ 11-12. Mr. Boone reported this information to Maj. Monroe, Officer

Jeff Weir, and Police Commissioner Si Devaeny shortly after he had received it, but

Defendant denies having received any such report from Mr. Boone.

On October 20, 2014, another Reserve Officer, Jeremy Morris, sent a

memorandum to Maj. Monroe indicating that he wished to file a formal sexual

harassment complaint against Chief Shock.  In that memorandum, Morris stated:

> During several occasions, Chief Shock has made inappropriate comments to a newly [sic] female reserve officer, Kelsie Lancaster. During a department meeting, I believe in August, Chief Shock made a statement to Officer Lancaster that she "needed to crawl under her professor's desk and earn her grade!"
>
> On another occasion, I was coming on shift around 3 PM on the 13th of September. As I was checking my mailbox, I noticed Officer Lancaster sitting in Chief Shock's office. I overheard a conversation that Chief Shock was having with Officer Lancaster and Chief Shock was asking her about the type of panties she wore. He continued to question her asking if she wore thongs or boy shorts. Then [sic] proceeded to ask her what type of panties she wore under dresses.

Exh. C to Boone Aff. Defendant maintains that Officer Morris's written complaint was

the first notice it received of any alleged complaint of sexual harassment by Chief Shock.

Shock Aff. ¶ 11.

Following Officer Morris's complaint, Maj. Monroe undertook an investigation of

the allegations, during which he and Officer Weir "spoke with several officers and

retrieved statements from officers who alleged they heard/did not hear the alleged

statements made by Chief Shock." Those interviewed included Officers Boone, Harber,

Fitzgerald, Myers and Lancaster. Monroe Aff. ¶ 9. However, on November 3, 2014, the

investigation "was stopped and [the investigating officers] notified the officers who

[they] had not received statements from yet that they no longer needed to provide them."

*Id.* ¶ 10. Mr. Boone asserts that this explains his failure to file a written statement. It is not clear from the record before us whether Chief Shock was disciplined based on this investigation.

**Departmental Transition**

In early October 2014, following discussion with the four merit officers of the Sheridan Police Department, Chief Shock decided to remove all officer ranks within the Department's Merit Officer and Reserve Officer Divisions, respectively. Shock Aff. ¶¶ 6-7. The Reserve Officers, including Mr. Boone, were notified of this impending change on October 6, 2014, and were informed that Maj. Monroe would immediately be taking control over the Reserve Officer Division. Exh. A to Shock Aff. As a result, Mr. Boone's title of Captain was removed and his scheduling responsibilities withdrawn. Shock Aff. ¶¶ 8-9; s*ee* Monroe Aff. ¶ 5. On October 22, 2014, the merit officers submitted their "ranks" to the Town Council, allowing the Town Council to adopt a new rank system. Shock Aff. ¶ 12.

**Plaintiff's Termination/Retirement**

According to Defendant, following implementation of these changes, Mr. Boone's "attitude significantly changed." He stopped providing information regarding his availability for particular shifts. Shock Aff. ¶¶ 13-14. After Maj. Monroe scheduled Mr. Boone to work three or four shifts in November 2014, Mr. Boone did not report for duty. *Id.* ¶ 7. Following these cancellations, Chief Shock requested that Maj. Monroe "contact [Mr.] Boone to discuss his future with the department and whether he planned to continue working as a reserve officer." *Id*. ¶ 15. Chief Shock concluded, based on Mr. Boone's

failure to appear for his scheduled shifts, that Mr. Boone had retired. In fact, Chief Shock

was subsequently told by a third party that Mr. Boone had, indeed, retired. *Id.* at ¶ 17.

Mr. Boone's retirement was reflected in a news item on December 3, 2014 that ran in the

*Hamilton County Reporter*. *Id.* Chief Shock testified that, having learned of Mr. Boone's

retirement, he sent a letter to Mr. Boone requesting the return of any and all equipment in

his possession that belonged to the Sheridan Police Department. *Id*. ¶ 18.

Mr. Boone disputes these facts, maintaining that he never retired, but was instead

terminated from his position by the Department. Specifically, he alleges that when he was

contacted by Maj. Monroe regarding work shifts in November, he was offered the "third

shift during the week," despite his typically having worked "weekday evening shifts…as

well as Friday, Saturday and Sunday shifts." Boone Aff. ¶ 18. Mr. Boone denies that he

ever failed to appear for a scheduled shift, contending instead that at the time he received

his shift assignments, he informed Maj. Monroe that he could not work third shift on

weekdays because those times "interfere[d] with…obligations to [his] day job." *Id.*  Mr.

Boone testified that Maj. Monroe failed to provide him with any alternative, non-

conflicting shifts.

Around this same time, in an October 30, 2014 email exchange, Chief Shock

asked Mr. Boone whether he planned to retire, and Mr. Boone replied that he "did not

intend to retire at that time but intended to continue to work as a reserve officer until May

or June of the following year." Exh. A to Boone Aff.  Mr. Boone alleges that shortly after

declining the day shift positions offered by Maj. Monroe and informing Chief Shock that

he was not planning to retire, he was informed by Maj. Monroe that he was required to

"either resign or be terminated."  Boone Aff. ¶ 20.  According to Mr. Boone, he told Maj.

Monroe that he had no intention of resigning. *Id.* However, following this conversation,

Mr. Boone was not scheduled for nor did he perform any further work as a Reserve

Officer.  Mr. Boone alleges that, thereafter, Defendant hired "five or six" additional

reserve officers, all of whom were younger than he. Boone Dep. at 59:1-3 ("And then

Coy Monroe hires, like, five or six guys from his security company that he worked for

which are, like, in their 20s.").

**Plaintiff's EEOC Charge**

Mr. Boone filed a charge with the Equal Employment Opportunity Commission

("EEOC") on or about November 5, 2014, (Compl. ¶ 6), citing age discrimination and

retaliation. Compl. Ex. A at 2. The EEOC issued Mr. Boone a right to sue letter on

November 5, 2014. *Id.* On February 17, 2015, the EEOC issued Mr. Boone a Dismissal

and Notice of Rights. Compl. Ex. B at 3.

**Events Following the Filing of EEOC Charge**

Mr. Boone alleges that, following the filing of his EEOC charge, persons

employed by Defendant have harassed his privately-owned "local establishment," which

maintains a liquor license, and have also interfered with his private security company.

Boone Aff. ¶¶ 14-16. Specifically, Mr. Boone claims that the Town began sending

officers to conduct unwarranted stops of patrons and employees of his establishment and

to question them along with requiring such "patrons and/or employees to submit to field

sobriety tests and/or breathalyzer tests." He alleges that officers would park their marked

police cars in the parking lot of his business establishment. *Id*. ¶ 16. With respect to his

private security company, Mr. Boone alleges that "instructions were given to the officers

and/or reserve officers employed by the Defendant that they should not perform work for

[Mr. Boone's] security company." *Id*. ¶ 14. Mr. Boone asserts that not only did this

impose challenges to his ability to secure sufficient staff, but officers were also

encouraged to work for one of his competitors. *Id.* at ¶ 15.

**The Instant Litigation**

On May 18, 2015, Mr. Boone filed the Complaint in this action advancing his

claims of age discrimination, hostile work environment, and retaliation against the Town

of Sheridan and the Sheridan Police Department. As noted above, we have dismissed the

Police Department because it is not a suable entity under state law. Further, by failing to

respond to arguments raised by Defendant in this summary judgment motion relating to

his hostile work environment claim, Mr. Boone is deemed to have abandoned it; that

claim is also therefore dismissed.  Accordingly, the remaining claims at issue are Mr.

Boone's ADEA and Title VII retaliation claims against the Town.

<u>Legal Analysis</u>

**I.      Standard of Review**

Summary judgment is appropriate when the record shows that there is "no genuine

issue as to any material fact and that the moving party is entitled to a judgment as a

matter of law." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

Disputes concerning material facts are genuine where the evidence is such that a

reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty

Lobby, Inc.*, 477 U.S. 242, 248 (1986). In deciding whether genuine issues of material

fact exist, the court construes all facts in a light most favorable to the non-moving party
and draws all reasonable inferences in favor of the non-moving party. *See id.* at 255.
However, a non-moving party may not rest solely on its pleadings to defeat summary
judgment. *See* Fed. R. Civ. Pro. 56(c).

## II.      Discussion

We begin our analysis with the threshold legal issue of whether as a Reserve
Officer Mr. Boone was an employee of the Town of Sheridan or only a volunteer, since
both Title VII and the ADEA apply only to an employee-employer relationship. *See* 42
U.S.C. § 2000e-3; 29 U.S.C. § 621. Both Title VII and the ADEA define an employee as
"an individual employed by an employer," (42 U.S.C. § 2000e(f); 29 U.S.C.A. § 630(f)),
and "refer neither to volunteers nor to payment or receipt of remuneration." *Geraty v.
Village of Antioch*, 2014 WL 5801440, at *2 (N.D. Ill. Nov. 7, 2014) (quoting *Volling v.
Antioch Rescue Squad*, No. 11 C 04920, 2012 WL 6021553 (N.D. Ill. Dec. 4, 2012)).
The Seventh Circuit has yet to address the standards to be applied in determining whether
an individual is an employee or a volunteer, for purposes of Title VII and the ADEA. *See
Doe v. Lee*, 943 F. Supp. 2d 870, 876 (N.D. Ill. 2013).

In a case such as this one, where we lack explicit guidance, the Supreme Court
"instruct[s] courts to use the common law principles of agency in lieu of a substantive
definition of 'employee.'" *Volling*, 2012 WL 6021553, at *7. In determining whether an
individual is an "employee" based on common law agency principles, we are to consider:

> the skill required; the source of the instrumentalities and tools; the location
> of the work; the duration of the relationship between the parties; whether
> the hiring party has the right to assign additional projects to the hired party;

the extent of the hired party's discretion over when and how long to work; the method of payment; the hired party's role in hiring and paying assistants; whether the work is part of the regular business of the hiring party; whether the hiring party is in business; the provision of employee benefits; and the tax treatment of the hired party.

*Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 323–34 (1992).  The Seventh Circuit "has distilled five factors from the common law of agency that are relevant to making the 'employee' determination," (*Doe*, 943 F. Supp. 2d at 875), in the context of determining whether a worker is an employee or independent contractor, including:

(1) the extent of the employer's control and supervision over the worker, including directions on scheduling and performance of work, (2) the kind of occupation and nature of skill required, including whether skills are obtained in the workplace, (3) responsibility for the costs of operation, such as equipment, supplies, fees, licenses, workplace, and maintenance of operations, (4) method and form of payment and benefits, and (5) length of job commitment and/or expectations.

*Maxxei v. Rock N Around Trucking, Inc.*, 246 F.3d 956, 963 (7th Cir. 2001) (quotation marks and citation omitted).

In applying these common law agency factors, our sister circuits have split "regarding the need to prove that a volunteer receives compensation before reaching any other elements germane to whether the volunteer is an employee under Title VII." *Geraty*, 2014 WL 5801440, at *4.  "The Second, Fourth, Fifth, Eighth, Tenth, and Eleventh Circuits follow the so-called 'threshold remuneration' rule," which requires the trial court to "conduct a two-step inquiry by requiring that a volunteer first show remuneration as a threshold matter before proceeding to the second step—analyzing the putative employment relationship under the common law agency test." *Id.* (cite omitted).  Importantly, under this approach, "[r]emuneration may consist of either direct

compensation, such as salary or wages, or indirect benefits that are not merely incidental to the activity performed." *Id.* (cite omitted). The Sixth and Ninth Circuits, in contrast, "consider remuneration as a non-dispositive factor, along with the other common law agency factors." *Id.* at \*5; *see Bryson v. Middlefield Volunteer Fire Dep't, Inc.*, 656 F.3d 348, 354 (6th Cir. 2011) (recognizing that because "no one factor, including remuneration, is decisive" under the common law agency test, "no one factor is an independent antecedent requirement").

In the absence of Seventh Circuit authority, one district court in our circuit noted that in trying to resolve whether an unpaid worker is an employee or volunteer as opposed to whether a worker is an independent contractor or employee, applying common law agency principles is "like using a screwdriver when the job calls for a wrench." *Holder v. Town of Bristol*, No. 3:09-CV-32 PPS, 2009 WL 3004552, at \*3 (N.D. Ind. Sept. 17, 2009). Another district court in our circuit has observed that "the employer control factor has limited relevance," when distinguishing between employees and volunteers for Title VII purposes. *Doe v. Lee*, 943 F. Supp. 2d 870, 875 (N.D. Ill. 2013).

After careful consideration, we share the view of the majority of circuits as well as the two district courts in our circuit as cited above and find that "remuneration in exchange for services is an essential condition to the existence of an employer-employee relationship." *Holder*, 2009 WL 3004552, at \*3 (collecting cases). Accordingly, we shall now apply the threshold remuneration test to the case before us.

11

The facts here are strikingly similar to those addressed in *Holder*, *supra*, in which case the court found that the plaintiff reserve officer was not an employee under Title VII. In that case, in exchange for his reserve officer service, Holder's benefits were limited to the following: "(1) free use of police equipment; (2) a uniform and dry cleaning allowance; (3) worker's compensation insurance; (4) disability insurance; and (5) state-funded life insurance for death in the line of duty." *Id.* at *5. There, the Court determined that the benefits did not constitute compensation because they had "no independent value" and were "not guaranteed forms of remuneration." *Id.* at *5.[3]

In addition to the matter of monetary compensation, the *Holder* Court considered the indirect, non-financial benefits received by plaintiff, observing that "remuneration can be direct or indirect and need not take the form of salary or wages." *Id.* at *3. One such indirect benefit was the potential value of the reserve officer position in terms of his future hiring potential; according to *Holder*, the position of reserve officer granted him "a legitimate expectation of future employment opportunities by virtue of the fact that several current paid officers were formerly reserve officers." *Id.* at *6. The Court found this argument unpersuasive, given that the plaintiff "offer[ed] no evidence that being a reserve officer provided a clear pathway to becoming a salaried officer." *Id.*

---

[3] By contrast, the Court of Appeals in *Haavistola v. Cmty. Fire Co. of Rising Sun, Inc.* viewed the following benefits as substantial enough to warrant a jury determination as to whether they constituted compensation: a state-funded disability pension, survivors' benefits, scholarships for dependents upon disability or death, group life insurance, tuition reimbursement for courses in emergency medical and fire service techniques, workers' compensation coverage, tax-exemptions, reduced-rates on commemorative license plates, and an opportunity to obtain paramedic certification. 6 F.3d 211, 221 (4th Cir. 1993).

In our case, it is undisputed that Mr. Boone received no compensation or health benefits as a Reserve Officer. The few benefits Mr. Boone did receive from Defendant—training, certifications, license plates and insurance for the vehicle he used while on patrol and life insurance—have little monetary value and were securely tied to his volunteer role. Shock Aff. ¶ 19. Mr. Boone claims that he also received certain benefits and discounts accorded by third parties due to his reserve officer status; however, these benefits are clearly beyond the scope of his relationship with Defendant and do not influence our analysis. *See Holder*, 2009 WL 3004552 at *3 (citing *York v. Assoc. of Bar of City of N.Y.*, 286 F.3d 122, 126 (2d Cir. 2002) ("Where no financial benefit is obtained by the purported employee *from the employer*, no 'plausible' employment relationship of any sort can be said to exist") (emphasis added)). Thus, the value of the benefits Mr. Boone received from Defendant in exchange for his service as a reserve officer was insubstantial, and, in any event, clearly less than those the plaintiff received in *Holder*. Having failed to establish that he was an employee of, rather than merely a volunteer for the Town of Sheridan under the threshold remuneration test, Mr. Boone's claim in this litigation fails as a matter of law.

## VI.    Conclusion

Mr. Boone has failed to establish that he was an employee of Defendant under Title VII or the ADEA.  Accordingly, Defendant's motion for summary judgment is GRANTED.  Final judgment shall enter in Defendant's favor.

IT IS SO ORDERED.

Date:   _8/16/2016_

SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

13

Distribution:

Robert M. Oakley
DILLEY & OAKLEY PC
firm@dilley-oakley.com

Daniel Kyle Dilley
DILLEY & OAKLEY, P.C.
d.dilley@dilley-oakley.com

Eric M. Wilkins
HUNT SUEDHOFF KALAMAROS
ewilkins@hsk-law.com